J-S24039-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| BRIAN ANTHONY CURRY | : | |
| | : | |
| Appellant | : | No. 144 WDA 2025 |

Appeal from the Judgment of Sentence Entered December 20, 2024
In the Court of Common Pleas of Westmoreland County Criminal Division
at No(s): CP-65-CR-0002986-2023

BEFORE: NICHOLS, J., McLAUGHLIN, J., and LANE, J.

MEMORANDUM BY LANE, J.: **FILED: September 4, 2025**

Brian Anthony Curry ("Curry") appeals from the judgment of sentence imposed following his convictions for strangulation, burglary, criminal trespass, simple assault, and two differing counts of intimidation of witnesses or victims.[1] We affirm.

We glean the following factual history from the evidence and testimony presented at trial. Up until they formally ended their relationship in February, 2023, Curry was living with his then-girlfriend, Kaylin Beech ("Beech"), and her eleven-year-old son in Beech's Greensburg, Pennsylvania residence. *See* N.T., 10/1/24, at 62, 104-06. Beech rented the property, and Curry's name was not on the lease. *See id*. at 63. After Curry moved out, the two continued to have "an on-again, off-again relationship from February until August,"

_____

[1] *See* 18 Pa.C.S.A. §§ 2718(a)(1), 3502(a)(1)(i), 3503(a)(1)(ii), 2701(a)(1), 4952(a)(1), (3).

during which they communicated "daily, usually" and spent "several nights together[,]" with Curry "just kind of showing up [at Beech's residence] whenever." *Id*. at 63, 105.

On August 19, 2023, Curry and Beech had been arguing on the phone throughout the day regarding Curry's infidelity and Beech's recent arrest in December, during which she had told police that the heroin found on her person came from Curry. *See id*. at 63-64. At some point during this lengthy call, Curry told Beech that he was going to come to her house. *Id*. at 64. In response, Beech told Curry that she goes "to bed early and that [Curry] could not continue to show up in the middle of the night demanding to get inside for his belongings or whatever he had left at [her] house." *Id*. Although Beech had instructed Curry to retrieve his belongings from her house on previous occasions, such that "every time he'd come [to Beech's house], he'd take stuff and leave[,]" and that Curry would repeat the process after disappearing "for a few days[,]" Curry had already retrieved most of his belongings by this date. *Id*.

Later that night, between midnight and 1:00 a.m., Beech awoke to hear someone "picking at" broken glass in her back door and attempting to gain entry into her residence.[2] *Id*. Beech assumed that this person was Curry and that he was coming to retrieve his belongings, as "he told [her] he wanted to come, [even though she] told him not to." *Id*. at 68. "Just a few seconds"

---

[2] Beech explained that she broke the glass previously when she threw a frying pan at Curry during a prior argument. *See* N.T., 10/1/24, at 68.

later, and with her phone in her hand, Beech unlocked and began to open the back door "to see who it was" when a knife-wielding Curry pushed his way in, "instantly grabbed [her] by the throat and threw [her] onto [the] kitchen floor[,]" whereupon he took away her phone, squeezed and applied pressure to her throat, and caused her to struggle to breath. *Id*. at 68-70. While they were on the floor, Curry stated "[t]hat he should gut [Beech] like a pig" and that she "left him standing outside . . . with drugs and warrants." *Id*. at 70-71. Curry subsequently held his knife up to Beech's face and threatened to cut her with it. *Id*. at 71. Throughout this sequence of events, Beech was "screaming" at Curry, "[g]o away, get out of my house[,]" and when she eventually managed to push the knife away, she sustained "a small cut on [her] finger." *Id*. at 71, 121-22.

"[A]t some point[,]" Curry released Beech and allowed her to run upstairs, whereupon she "tried to wake up [her sleeping] son[,]" who had a "father/son relationship" with Curry and could calm him down, as she feared that Curry "was going to hurt" her in his angered state. *Id*. at 73, 125. Soon thereafter, Curry followed Beech upstairs into her son's bedroom to continue to argue with her while "getting violent [and] throwing stuff around [the] house." *Id*. at 74. During the continuation of this argument, Curry again "grabbed [Beech] by [the] throat and threw [her] back down" to the floor to continue choking her. *Id*. at 74, 76. With a "knife in his hand[,]" Curry then told Beech that "he would cut [her] hair off to make [her] ugly so nobody would want [her,]" and that "he would shoot [her] with heroin to make it look

like [she] overdosed and relapsed [even though she] had [been clean for] some time . . . and [she] was starting to get [her] kids back and [her] life back together." *Id*. at 74, 81.

When Beech's son awoke to this commotion, he managed to calm Curry down to the point where Curry physically disengaged from Beech and instead began "talking to [him and] telling him how [Beech was] a bad woman and [that she] deserved the treatment that [she] was getting because of all of the bad things that [she had] done to him." *Id*. at 74, 126. Although visibly upset by the situation, Beech's son eventually went back to sleep, whereupon Curry and Beech continued to argue until approximately 4:30 a.m., when "[e]verything got real quiet." *Id*. at 77. Beech thereafter informed Curry that she "was scheduled to go to work" that morning, and Curry in-turn "insisted that [she] go to work and act like everything is okay." *Id*. Beech did not go back to sleep but instead checked on Curry multiple times throughout the remainder of the night, during which she found him either "sitting downstairs . . . getting high" or sleeping on the couch. *Id*. at 77-78, 126-27.

While she was getting ready for work later that morning, Curry engaged her in conversation once more to talk about "everything that was going on between" them. *Id*. at 78-79. This conversation eventually resulted in the pair having sex, with Curry afterwards returning Beech's phone to her so that she could leave for work at 8:30 a.m. *Id*. at 78-79, 81. Notably, however, just before Curry returned the phone to Beech, he explicitly told her "not to call the police on him[,]" that if she "called the police, he would go to jail, and

he didn't want to go to jail[,]" and that "people would come to [Beech's] house to hurt [her] if [she] ever told anyone what [he] said or did to [her]." *Id*. at 82. After leaving the house, Beech did not immediately report the incident to police, as she feared that Curry would "be on the run [from police] and com[e] to hurt [her] before [she] could get help" and that she was "aware of what [Curry was] capable of" given that after "almost eight years of a relationship with" him she felt it had come "to the point where [she] was going to die on [her] son's bedroom floor." *Id*. at 83.

Curry remained at Beech's home with her son until she returned from work at "about 5:30" p.m., at which point Beech "explained to him that [she] had to go see [her] probation officer in the morning[.]" *Id*. at 80. "[T]o avoid being seen by anybody that would arrest him[,]" Curry expressed a willingness to leave and asked Beech to drive him to a residence in Jeannette, Pennsylvania, which she then did. *Id*. As a result of Curry's actions the previous night, Beech sustained a cut to her finger, which she took a picture of, "completely lost [her] voice" to the extent that she could not "really talk" for "a few days," and experienced "some bruising on her neck" which prevented her from turning her head for "about a week and a half." *Id*. at 86.

The following morning, Beech called Deputy Robby Orbin ("Deputy Orbin") of the Westmoreland County Sheriff's Office, "explained to him what was going on[,]" and told him that "if [he found] her with a needle in her arm, [to] please know that she didn't do it, she's been clean, and that it would be

. . . Curry that was responsible." *Id*. at 84, 146-47. Although Deputy Orbin encouraged Beech to call the police after hearing about the incident, Beech refrained from doing so, explaining that she "was not going to Greensburg PD because she was terrified" and that she wanted to wait until Curry was in police custody for his outstanding warrants. *Id*. at 148. Immediately thereafter, Beech reported to her probation officer, Nick Baker ("Baker"), whereupon she told him about the incident as well. *Id*. at 85. Baker similarly advised Beech that "she would have to report this to the police," and Beech in-turn confided to him that she was afraid to do so as "she was afraid [of] retaliation from . . . Curry." *Id*. at 143. Although Baker noted that Beech was very upset and uncertain as to what to do about her situation, he did not notice that she had any injuries. *Id*. at 144-45. Beech subsequently headed directly to work, where she recounted the story once more to her boss. *See id*. at 134-35.

Within twenty-four hours of Beech's call to Deputy Orbin, police arrested Curry on his outstanding warrants, and "[a] day or two later," Beech officially reported the incident to police.[3] *Id*. at 87, 147-48. Although both Detective Orbin and Officer Frank Tempo ("Officer Tempo") noticed a cut on Beech's finger while she was submitting this report at the police station, neither officer

---

[3] Beech later clarified that she waited a few days to make the report due to the fact that she "didn't really want to put Curry in jail [and that] she wasn't really out to get him" but did so nonetheless because her "son was extremely terrified by what happened, and [she] was scared by what happened and what potentially could happen leading up from this." N.T., 10/1/24, at 84.

noticed any other injuries. *Id*. at 147-48, 154. Following the receipt of this report, police charged Curry with, *inter alia*, the above-listed crimes. Notably, however, while Curry was in jail pending these charges, Beech continued to communicate with him over the phone. *Id*. at 87-88. During "[a] lot" of these calls, Curry would tell Beech that she needed to "call his lawyer to get the charges dropped[.]" *Id*.

In October 2024, Curry proceeded to a jury trial, during which the Commonwealth presented testimony from Beech, Baker, Deputy Orbin, and Officer Tempo, who each testified, in part, to the above sequence of events. Curry testified in his defense. In doing so, Curry outlined a version of events which contradicted much of the narrative provided by the Commonwealth's witnesses. Specifically, Curry testified that on the evening of August 19, 2023, he arrived at Beech's home at 10:24 p.m., and that he had only visited Beech that night because she had previously messaged him to ask that he "come home and spend time with her and [her son], and [to] stop hanging out with [his] drug addict friends[.]" *Id*. at 197-98. Curry further testified that minutes prior to his arrival at Beech's residence, he had messaged her that he would "be there in three minutes[,]" and that she had in-turn responded to "hurry up[.]" *Id*. at 201.

Curry maintained that while he was standing at Beech's locked back door, he had attempted to call Beech's phone, but was unsuccessful in reaching her as "it went right to voice mail." *Id*. Curry stated that he also messaged Beech that he had arrived, but still received no response. *See id*.

As a result, Curry testified that because Beech had messaged him three minutes prior to "hurry up[,]" he believed he had permission to enter the residence and began unlocking the partially-broken back door with his pocketknife. *Id*. at 202. In the process of doing so, however, Curry stated that he received a message from Beech telling him "never[ ]mind, go away." *Id*. Curry explained that this message made him "nervous" as it made him believe that he was involved in "something that could end up with [him] going to jail[,]" and that he should therefore call "for a ride out of there." *Id*.[4] Curry relayed that before he could leave, however, he heard "the dead bolt on the door click loud, very loud[,]" such that instead of leaving, Curry decided to then enter Beech's residence, where he found her "standing [opposite him] in the pitch-dark kitchen[.]" *Id*. at 203.

Curry elaborated that although he was uncertain "if [he] hit her with the door or [if he instead] bumped her" when he opened it, his doing so caused Beech to stumble backwards and drop her phone onto the kitchen floor with its screen facing up. *Id*. at 203-04. Curry testified that "because of [a] previous incident [where he was captured by police at Beech's residence, he] thought [Beech] was calling the cops[ on him,]" and that he subsequently "grabbed [her] phone" because of this. *Id*. Curry further stated, however,

---

[4] We note that Curry did not present any of the text messages he purportedly sent or received from Beech on the evening of August 19, 2023, as evidence at trial, nor did he present any evidence regarding when he arrived at Beech's residence, as he explained that his dad currently had his phone, and that he "had paid somebody cash to use their Uber" to travel to Beech's home that night. N.T., 10/1/24, at 220.

that because Beech immediately started "screeching, give me my phone give me my phone[,] he immediately gave [the phone] back to her[,]" as he "did not want the neighbor to hear [Beech's] screams[.]" *Id*. at 204. Curry asserted that the remainder of the "whole altercation was verbal from this point on" and that when he initially entered the home, he had "stuck [his knife] in the floor." *Id*. at 204-05. As such, Curry explicitly denied ever choking Beech, "going around destroying things[,]" or saying that "he would cut all [her] hair off and make [her] ugly[,]" as he instead testified that he had only "yelled at [Beech and] said a lot of [other] nasty things" while threatening to go stay with another woman. *Id*. at 206-08.

Curry further denied that Beech's son was sleeping when he arrived, as he testified that before he had resigned himself to staying the night, and while he was packing up his belongings to leave, both Beech and her son were actively begging him to stay. *See id*. at 209. Curry clarified, however, that because of how the night had gone up until that point, he slept downstairs on the couch, away from Beech and her son who remained upstairs, and used heroin. *See id*. at 210-11. Curry then testified that when he woke up the next morning, he discovered that his "pants were down to [his] knees, . . . Beech was on top of [him,] kissing [his] neck . . . and she [was asking him to] have makeup sex." *Id*. at 211. Curry maintains that before they proceeded to have sex, he asked Beech the whereabouts of her son, to which she replied that she had already taken him "to his dad's in Jeannette." *Id*. at 212. Curry then affirmed that Beech left for work after they finished having

sex, that he stayed in her home until she returned, and that she thereafter drove him back to Jeannette. *See id*. at 214.

At the beginning of the second day of trial, the Commonwealth orally motioned the court to reopen the record as a result of it learning that Beech received twelve phone calls the previous night "from [Curry's] account with the jail[,]" and in violation of a no-contact condition of Curry's bond. N.T., 10/3/24, at 230-31. Over a general objection by Curry's counsel, the trial court granted the motion, and the jury subsequently heard testimony from both Beech and Curry solely regarding these calls. *See id*. at 240. Pertinently, Beech testified that she did not answer any of these calls the prior night, that she believed they were from Curry, and that they caused her fear. *See id*. at 242-44. In response, Curry testified that: (1) he made each of these phone calls despite his awareness of the no-contact order; (2) he didn't intend to threaten Beech that night; and (3) he made the calls because he was "scared for [his] life[,]" and he wanted Beech to obtain missing text messages so that she could forward them to his attorney. *Id*. at 248-49.

At the conclusion of the trial, the jury convicted Curry of strangulation, burglary, criminal trespass, simple assault, and two differing counts of intimidation of witnesses or victims. On December 20, 2024, following the preparation of a pre-sentence investigation report, the trial court imposed an aggregate sentence of sixteen to thirty-two years' incarceration, followed by a twelve-month probationary period. Curry filed a timely post-sentence motion in which he initially challenged, *inter alia*, that the jury's verdict was

against the weight of the evidence. **See** Post-Sentence Motion, 12/30/24, at unnumbered 2-3. At a subsequent hearing, Curry orally motioned the trial court to amend his post-sentence motion to include a sufficiency claim as it pertained to his convictions for burglary and criminal trespass. The trial court permitted this amendment, and following the hearing, ultimately denied relief. Curry filed a timely notice of appeal, and both he and the trial court complied with Pa.R.A.P. 1925.

Curry raises the following issues for our review:

1. Whether [Curry's] conviction for burglary was without sufficient evidence when the Commonwealth failed to prove [he] entered [Beech's residence] with the intent to commit a crime therein?

2. Whether [Curry's] convictions were against the weight of the evidence when the Commonwealth's primary witness, . . . Beech, gave an unreliable and uncorroborated version of events leading to [Curry's] conviction at all counts?

Curry's Brief at 2 (issues reordered).

In his first issue, Curry argues the evidence was insufficient to support his conviction for burglary. A challenge to the sufficiency of the evidence presents a question of law for which our standard of review is *de novo*, and our scope of review is plenary. **See Commonwealth v. Johnson**, 236 A.3d 1141, 1152 (Pa. Super. 2020) (*en banc*). When considering a challenge to the sufficiency of the evidence:

> [W]e evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof

by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Accordingly, the fact that the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of innocence. Significantly, we may not substitute our judgment for that of the fact finder; thus, so long as the evidence adduced, accepted in the light most favorable to the Commonwealth, demonstrates the respective elements of a defendant's crimes beyond a reasonable doubt, the appellant's convictions will be upheld.

*Commonwealth v. Franklin*, 69 A.3d 719, 722-23 (Pa. Super. 2013) (quotations marks, brackets, and citations omitted). Importantly, "the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence." *Commonwealth v. Orr*, 38 A.3d 868, 873 (Pa. Super. 2011) (*en banc*) (citations and brackets omitted).

A person commits the crime of burglary if he enters a building or occupied structure, with the intent to commit a crime therein, in which at the time of the offense any person is present and the person commits, attempts or threatens to commit a bodily injury crime. *See* 18 Pa.C.S.A. § 3502(a)(1)(i).

Curry argues that the Commonwealth's evidence, "[e]ven when viewed in the light most favorable to" it, fails to show that Curry "initially entered

[Beech's residence] with the intent to commit a crime therein." Curry's Brief at 20. Pertinently, Curry maintains that Beech's testimony instead reveals that he had permission to enter her residence that night, as she testified that: (1) "it was common for [Curry] to stay at her residence, despite them having ended their relationship months prior[;]" and (2) Curry had told Beech earlier that day that "he was coming to her home to retrieve his belongings . . . and she responded by stating she goes to bed early and he could not continue to retrieve his belongings in the middle of the night." *Id*. As it relates to this second point, Curry highlights that "it remains unclear [as to] whether Beech's statement is a clear indication that [Curry] was on notice he was not permitted to be at the home." *Id*.

Curry further emphasizes that "[t]he Commonwealth adduced no evidence [that he] forced entry into the residence . . . to commit a criminal offense" as Beech "assumed he was there to get his belongings, which he had previously stated, [and] never testified [that] she was alarmed or startled by Curry's appearance at the home[,] as she [had] expected him given their prior conversation." Curry additionally explains that "[w]hen [Beech] proceeded to let him into the residence," he only grabbed her by the neck in the midst of a dispute which ensued only after he had entered the home. *Id*. at 20-21. Curry asserts that these facts therefore show that "Beech permitted [him] to enter [the] home[,] and [that] a dispute of some nature occurred thereafter." *Id*. at 21. Thus, Curry argues that because the Commonwealth's evidence only showed that he entered the home "with the intent to retrieve his belongs"

and that "a crime may have occurred subsequent to his entry if the Commonwealth's evidence is to be believed, [it] falls short" of proving he committed burglary by entering the home with the intent to commit a crime therein. *Id*.

The trial court determined that the evidence was sufficient to support Curry's conviction for burglary, reasoning as follows:

> This court, having reviewed the entire record in this case and viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, finds that the Commonwealth has presented sufficient evidence to find [Curry] guilty of burglary, in violation of [section] 3502(a)(1)(i). The court finds evidence was entered that [Curry] was not named on [Beech's] lease and that he no longer resided there. [Beech] was allowing [Curry] to stay there at her discretion. [Beech] specifically asked [Curry] not to come to her home in the middle of the night. He clearly did not possess a key to the home as [he] was fumbling to open the door. Nonetheless, [Curry] came to [Beech's] home in the middle of the night and entered her residence with the intent to commit a crime, namely to physically harm [Beech] as is demonstrated by his possession of a knife and his immediate grabbing and squeezing of [Beech's] throat causing her to struggle to breathe. Additionally, [Curry] did in fact cause [Beech] to suffer several bodily injuries, such as a laceration to her finger and marks on or about her neck and neck spasms for the week and a half following the incident.

Trial Court Opinion, 4/2/25, at 10-11 (unnecessary capitalization omitted).

Viewing the record in the light most favorable to the Commonwealth as the verdict winner, we determine the evidence was sufficient to support Curry's burglary conviction. In the instant case, Curry arrived at Beech's house in the middle of the night, despite his knowledge that she had gone to sleep and with the recent understanding that Beech did not want him visiting

her home during these nighttime hours. While at the house, Curry did not attempt to announce his arrival, as he did not call, message, or otherwise try to contact Beech. Instead, Curry, who was wielding a pocketknife, proceeded directly to Beech's back door, which he knew was broken, and quietly attempted to pick away the glass and undo the deadbolt lock while obscured by the night. When Beech subsequently unlocked the door to confirm her suspicion that it was Curry who was attempting to gain entry into her home, Curry forcibly pushed his way in, immediately grabbed her by the throat, threw her to the ground, and held his knife against her face while making threats to cut her. This record, read in the light most favorable to the Commonwealth, clearly establishes that Curry entered Beech's home with a criminal intent to harm Beech and place her in a state of fear. Accordingly, we determine this evidence is sufficient to support Curry's conviction for burglary, and we conclude his first issue is without merit.

In his second issue, Curry argues that each of his convictions was against the weight of the evidence. As our Supreme Court has explained:

> A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict. Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner. An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. A trial judge must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against

the weight of the evidence do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that "notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice."

*Commonwealth v. Widmer*, 744 A.2d 745, 751-52 (Pa. 2000) (citations and footnote omitted). "The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none or some of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Talbert*, 129 A.3d 536, 545 (Pa. Super. 2015) (brackets and citation omitted). Thus, in order for a defendant to prevail on a challenge to the weight of the evidence, "the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the trial court." *Id*. at 546 (citation omitted).

An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

> Appellate review of a weight claim *is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence*. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (citations omitted, emphasis in original).

Curry argues that his convictions were against the weight of the evidence, as "[t]he facts elucidated by the Commonwealth at trial . . . are not only bizarre, but unbelievable." Curry's Brief at 12. Curry highlights that "the jury elected to believe Beech, despite the fact that she made "numerous . . . incredible claims" and that "[i]t is implied from the testimony that [her] deflection of blame onto [Curry for her prior December arrest for possession of heroin] was a false allegation that led to them both being arrested[ and ending their relationship]." *Id*. Curry avers that despite their formal breakup, he and Beech "continued to maintain a relationship, with Curry staying at [Beech's] residence several nights a week" such that "[i]t should have been no shock" to Beech when he informed her he would be coming to her home that night "to retrieve some of his belongings." *Id*. at 12-13. Indeed, Curry contends that "[r]ather than telling [him] not to come, Beech simply stated" that she goes to bed early and "that he could not continue to show up in the middle of the night demanding to get inside for his belongings or whatever he had left . . .." *Id*. at 13.

Curry emphasizes that when he "arrived, Beech did not alert authorities to his presence as a trespasser[,] and instead assumed he had arrived for his belongings and *let him into the home*." *Id*. (emphasis in original). As such, Curry argues that Beech's permission to enter the home "is evidence enough that his conviction for criminal trespass is manifest injustice." *Id*. Curry continues that even if Beech's reply "that he could not continue to come to

the home in the middle of the night to gather his belongings is sufficient" to have put him on notice that he was not welcome, "the Commonwealth has otherwise failed to produce any evidence [that he] broke into the home." *Id*. at 13-14. Curry instead maintains that "the Commonwealth's own evidence suggests [he] was permitted entry into the home before a dispute occurred" such that "[t]his Court should therefore vacate" his burglary conviction as it "is a patent contradiction to the evidence at trial." *Id*.

Curry further maintains that his "conviction for burglary is a manifest injustice as [Beech's] testimony regarding [his] entry of the home and subsequent assault is not only unbelievable, but the Commonwealth failed to prove the requisite elements . . . beyond a reasonable doubt." *Id*. at 15.[5] Specifically, Curry avers that the jury should not have found Beech's testimony, that he "grabbed her by the throat, seemingly for no reason[,]" sufficient to convict him of burglary, as: (1) Beech was aware "Curry was coming to the home; (2) she let him in the home; and (3) Beech noted he was coming to the home to gather his belongings." *Id*. at 14. Curry additionally asserts that "[t]he testimony regarding the events after [he]

_____

[5] We note that Curry's argument that "the Commonwealth failed to prove the requisite elements [of burglary] beyond a reasonable doubt" is a challenge to the sufficiency of the evidence, and not the weight. Curry's Brief at 15. Accordingly, because we determined *supra* that the Commonwealth's evidence was sufficient to support Curry's burglary conviction, and because a challenge to the weight of the evidence "concedes that there is sufficient evidence to sustain the verdict[,]" this argument is moot. *Widmer*, at 751.

entered the home are more implausible than the entry itself." *Id*. at 15. Curry points out that although Beech claimed "he brandished a knife [and gave] her a small cut on the finger when she pushed it away[,]" and that she "did appear to have a cut on her finger when she reported these events three . . . days later, no knife was [ever] recovered." *Id*. "Moreover, [Curry calls attention to the fact that the] authorities noted that Beech did not appear to suffer any injuries to her neck area, despite [her] testimony claiming her neck was bruised." *Id*. As such, Curry argues that although "[t]hese inconsistencies are glaring[, they] seemingly were of no concern to the jury, as they convicted [him] of both burglary and strangulation." *Id*.

Curry emphasizes that although Beech testified that they both continued to argue for multiple hours and that Curry "continuously retreated to another area of the home to get 'high,' Beech made no effort to alert authorities to the purported assault *even when Curry slept* due to her purported fear of him harming her before she could get away." *Id*. at 16. (emphasis in original). He similarly notes that "even when Beech later got away, she refrained from contacting authorities for three . . . days[,]" despite the fact that she had a cell phone. *Id*. "Perhaps most jarringly, [Curry stresses that] despite her reported fear of [him] after a night of violence, arguments, and threats, Beech voluntarily had sex with" him before she left him home with her son the following morning to leave for work. *Id*. Curry further states that "when Beech later returned home, she elected to give [him] a ride to Jeannette,

[Pennsylvania, and that s]he continued to speak with him in the following days, maintaining that she did not want to see him in trouble." *Id*. at 16-17. Moreover, Curry contends that "[t]he Commonwealth produced no witnesses to corroborate physical evidence of the assault from Beech's workplace or otherwise until Officer Tempo noticed a small cut on her hand three . . . days later." *Id*.

Accordingly, Curry maintains that in light of the above, "the jury should not have believed . . . Beech's version of events" and that his "convictions at all counts — especially those for burglary and criminal trespass — defy Beech's seemingly irrational behavior in the face of violence and the threat of violence." *Id*. Indeed, Curry avers that "[a]n objective observer of these events would conclude Beech's failure to disclose [them] was not due to fear, but because they did not occur in a manner consistent with [her] testimony." *Id*. Consequently, Curry argues that because "his convictions were the result of unreliable and uncorroborated testimony resulting in a manifest injustice[,]" this Court should "vacate [his] convictions at all counts and remand this matter for a new trial[.]" *Id*. at 17-18.

The trial court considered Curry's weight challenge and concluded that it lacked merit, reasoning as follows:

> The court finds that [Beech] testified that [Curry] came to her residence and began attempting to secure access to the inside of her home by picking at glass that was previously broken on the door. She further testified that [Curry] was not residing there at the time and she had asked him not to come over at that time. When she opened the door, [Curry] immediately entered her

home with a knife in his hand, grabbed her by the throat, and was squeezing her neck and applying pressure. [Beech] stated that she struggled to breathe and suffered bodily injury. Afterwards, her throat was sore and she had muscle spasms in her neck for approximately one week and a half. [Beech] also received a small laceration to her right pointer finger.

The court further finds that during conversations between [Beech] and [Curry], while he was incarcerated following this incident, [Curry] requested on multiple occasions that she contact his attorney so that she could have the charges dropped.

Based on the foregoing analysis, the jury's verdict is consistent with the testimony offered by the Commonwealth and is not so contrary to shock[] one's sense of justice.

Trial Court Opinion, 4/2/25, at 9-10 (unnecessary capitalization omitted).

Based on our review, we discern no abuse of discretion by the trial court in denying Curry's challenge to the weight of the evidence. As explained above, this Court will give the gravest consideration to the findings and reasons advanced by the trial court judge when reviewing its determination as to whether the verdict is against the weight of the evidence. *See Clay*, 64 A.3d at 1055. Moreover, one of the least assailable reasons for denying a new trial is the lower court's conviction that the verdict was not against the weight of the evidence. *See id*.

Here, Curry is essentially asking this Court to reweigh the evidence to accord no weight to the testimony provided by Beech that: (1) Curry did not live with her and she did not invite or willingly let Curry into her house on August 19, 2023; (2) Curry placed her in a state of fear when he forced his way into the home with a knife and began choking her; (3) Curry threatened to cut her while holding a knife against her face, before subsequently doing

so when she pushed the knife away; (4) Curry intimated that "people would come to [Beech's] house to hurt [her] if [she] ever told anyone what [he] said or did to [her;]" and (5) she suffered injuries to her neck and finger as a result of the incident. *Id*. at 82. This, we cannot do. ***See Talbert***, 129 A.3d at 545 (holding that the weight to be accorded to the evidence and testimony presented at trial was exclusively for the jury, which was free to believe all, part, or none of the evidence and testimony and to determine credibility). Rather, this Court's role is to review the exercise of discretion by the trial court in ruling on the weight claim. In this regard, we discern no abuse of such discretion.

Importantly, we note that the trial court judge determined that Curry's guilty verdicts did not shock his conscience. Further, we emphasize that in addition to hearing Beech's testimony to the above, the trial court credited the testimony of Deputy Orbin and her probation officer, Baker, who each separately confirmed Beech's narrative of the incident based on what she had told them soon after it had occurred, and while she was still in a fearful state. The court additionally credited the testimony of both Deputy Orbin and Officer Tempo, who each noticed that Beech had a cut on her finger when she was at the police station giving a report. Lastly, based on the numerous phone calls that Curry made to Beech while he was incarcerated, the trial court recognized that Curry made multiple attempts to control and manipulate Beech by demanding that she contact his attorney and get the charges dropped, regardless of her vocalized desire not to do so. On this record, we discern no

abuse of discretion by the trial court in denying Curry's weight challenge, and we conclude that his second issue is therefore meritless. Thus, as neither of Curry's issues have merit, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 9/4/2025